In re SANDMAR CORPORATION, Debtor.

Bankruptcy No. 81–00017P.

United States Bankruptcy Court, D. New Mexico.

July 31, 1981.

Stephen J. Vogel, Albuquerque, N.M., for Sandmar Corp.

George P. Vlassis, Phoenix, Ariz., for Navajo Tribe.

## MEMORANDUM OPINION

LOUIS PUCCINI, Jr., Bankruptcy Judge.

Sandmar Corporation, a Debtor in a Chapter 11 bankruptcy proceeding, moved this Court for an Order to Show Cause why the Navajo Tribe, and Tribal Agents, should not be held in contempt of Court. Such an Order to Show Cause was issued on February 9, 1981. The show cause hearing was held on March 25, 1981. Sandmar was present in person by its President, Earl Stewart, and its attorney, Stephen J. Vogel. The Navajo Tribe was present in the person of Michael Tang, Tribal Agent, and its attorney, George P. Vlassis.

## FACTS

Sandmar Corporation (hereinafter referred to as Sandmar), a New Mexico corporation, leased improvements on land within the Navajo reservation from the Navajo Tribe. Sandmar entered into possession of the property in September, 1973. Sandmar failed to keep current its lease obligations with the Tribe. A notice of lease violation was sent to Sandmar on December 23, 1980. The notice demanded cure of the lease violation within twenty (20) days or the lease would be terminated.

On January 8, 1981, Sandmar filed a petition in Chapter 11 with this Court, and relief was ordered. Thus, on that day, an automatic stay went into effect, prescribing action defined in 11 U.S.C. § 362. The Advisory Committee of the Navajo Tribal Counsel met five (5) days later on January 14, 1981. According to the affidavit of the committee's legislative secretary, who kept the minutes of that meeting, no member of the committee indicated that he knew that a bankruptcy petition had been filed. However, testimony at the show cause hearing indicated that, even at that time, committee members had heard "rumors" that a petition might have been filed.

The evidence indicated that at another January 14, 1981 meeting of tribal administrators, there occurred a prolonged conversation about whether or not the Tribe's

knowledge of the Sandmar bankruptcy was actual or constructive. Some members indicated that the Navajo Tribal Utility Authority had received notice of the bankruptcy. Apparently, the Respondent, the Navajo Tribe, Michael Tang, and others, had some knowledge or at least suspicion of the filing. This is conceded by the Respondent in its brief, page 2, of Section II. It is without explanation why the tribal officials and their lawyers, suspecting a bankruptcy, refused to make any inquiry at all of the Debtor or the Bankruptcy Clerk, if there was in fact an actual filing. They chose instead to debate the effect of actual or constructive notice, and to shun actual notice.

Rather than determining if a petition had been filed, the counsel for the Tribe, Mr. Tang, Mr. Vlassis, and others present at that meeting considered, apparently at some length, the question of whether the Bankruptcy Court would have jurisdiction over the Tribe if the Tribe were to violate the automatic stay which was in effect at that time.

In the late evening, at about 9:30 P.M., on Monday, January 19, 1981, Michael Tang, acting as staff attorney for the Tribe, and as apparent leader acting pursuant to the orders of the Advisory Committee of the Navajo Tribal Counsel, arrived at the premises of the Debtor, with ten to twelve other persons, some of whom were armed Navajo Tribal Police, and physically took possession of the premises. At that time, before actual possession occurred, the evidence is uncontradicted that Earl Stewart, the president of the Debtor and operating as manager of the business premises, advised Tang of the filing of the Chapter 11 bankruptcy petition. Tang proceeded with the others, despite the notice, to take possession of the premises and all assets. Stewart was directed, at that time, to remove himself from the premises, packed his personal belongings into his vehicle, and left.

Since that time the Tribe has remained in possession and has prevented the return of Sandmar officers and agents. If the Tribe did not have actual notice of the petition, and hence the stay, prior to that point, it was on notice at that moment. Nevertheless, with full knowledge that the bankruptcy had been filed, Mr. Tang and the other tribal officials who were present completed the repossession of the premises.

It is also uncontested that all of the assets of Debtor are leased premises and personal property, all located on lands belonging to the Navajo Tribe at Window Rock, Arizona.

The leased property consisted of a motor inn and other structures leased to other governmental agencies. Since the date of the repossession and take over, all of the affairs of Sandmar have been handled through a trust account established by the Tribe. The Tribe has apparently perpetuated the business and kept it segregated from other activities of the Tribe. The other tenants have been requested to make payments on their sub-leases to the Tribe. The result of the present situation is that Sandmar is unable to obtain funds to make any payments in the Chapter 11 proceeding and has lost possession of all of its assets, and would thus be unable to develop any plan of reorganization.

This case is one of first impression under the Bankruptcy Code.

## 1. *SOVEREIGN IMMUNITY*

The primary question in this case is whether this Court has jurisdiction over the Navajo Tribe in view of the Tribe's retained sovereign immunity. All parties agree that the Indian Tribes enjoy a degree of immunity from suit by virtue of their status as a quasi-sovereign nation. It is further agreed that that immunity can be limited at any time by act of Congress. Remaining is the question of whether, in the absence of a statute which specifically limits that immunity, the Tribe's immunity is total or can be limited by other circumstances and if so, is it limited here.

At one extreme end of this issue is the Debtor's argument that a general federal statute applicable to all persons includes Indians. The key case, *Choteau v. Burnet,*

*Commissioner of Internal Revenue*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931), involves an individual member of the Osage tribe who claimed that the Internal Revenue Act of 1918 did not apply to his income, presumably since the statute did not specifically refer to Indians. The Court there held that the language "every individual" was broad enough to include Indians. This case, is however, not directly on point since an individual member of the tribe, rather than the tribe itself, was making a claim for immunity from the statute.

A similar later case, *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), held:

> ... it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests.

In the *Tuscarora* case, *the tribe itself* contended that § 21 of the Federal Power Act which permitted the taking of land adjacent to a natural power site on the Niagara River to be taken for the storage reservoir of a hydroelectric power project did not apply to land owned by the tribe.

The Court held that by the board terms of § 21, which did not specifically exclude Indian lands, Congress intended to authorize the taking of lands owned by Indians as well as other citizens. A distinguishing feature, in this case, is that lands were not reservation land and not subject to any treaty between the United States and the Tuscarora Nation. The lands were purchased and owned in fee simple by the tribe and there was nothing to distinguish the tribe from any other citizens owning property except their status as a tribe.

A further distinction between both of these cases and the case at bar is that in neither of the cited cases was the question of a tribe's immunity from suit at issue. This Court is unwilling to conclude that every general statute applies to Indian tribes.

At the other extreme end of the spectrum in the absence of a statute which, in clear language, says that it applies to the tribes.

For that proposition, the Tribe cites *United States v. United States Fidelity and Guarantee Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). The Court there held:

> These Indian Nations are exempt from suit without Congressional authorization. It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did.

A more recent case, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), (*Martinez*), reaffirms this principle stating that "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by Sovereign powers.... without congressional authorization the Indian Nations are exempt from suit." See also *Turner v. United States*, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919), and *Puyallup Tribe, Inc. v. Washington Dept. of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977).

Despite the strong language in these cases, it is clear from the cases cited below that there are circumstances under which, even in the absence of congressional authorization, federal courts have found the immunity of the tribes to be limited. Such immunity may be withdrawn as a result of their dependent status.

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, *or by implication as a necessary result of their dependent status.* (Emphasis added). *Oliphant v. Suguamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) and *United States v. Wheeler*, 435 U.S. 313, 315, 98 S.Ct. 1079, 1081, 55 L.Ed.2d 303 (1978).

The tribe's argument in *Oliphant* and *Wheeler* are criminal cases and that their

holdings must be limited to criminal cases is unfounded. First, civil cases finding against the tribes claims have adopted the language of *Oliphant* and *Wheeler.* See *Montana v. United States,* —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and *UNC Resources, Inc. v. Kee Joe Benally,* 514 F.Supp. 358 (D.C.N.M.1981).

Further, the real crux of those cases was not a criminal versus civil distinction but rather a distinction between internal matters and external matters.

The Court in *Wheeler* stated at 435 U.S. 326, 98 S.Ct. 1087 that the areas in which "implicit" divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and non-members of the tribe. The Court goes on to point out examples of implicit divestiture of sovereignty such as the inability of Indian Tribes to alienate land to non-Indians, either into commercial or government relations with foreign nations and try non-members in tribal courts. The Court in *Wheeler* concludes that "these limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations."

An even stronger statement of limitations on the tribes based on this distinction is:

> . . . [the] exercise of tribal power beyond what is necessary to protect tribal self government or to control internal relations is inconsistent with the dependent status of tribes and so cannot survive without express congressional delegation, *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

It is obvious that the Congress has authority to establish uniform laws on the subject of bankruptcy throughout the U.S. U.S.Const. Art. I, § 8[4]. No statute or treaty had been cited which give the Navajo Tribe or any other Indian tribes authority to litigate bankruptcy issues with non-Indians.

The most succinct and current statement of the law from the Supreme Court appears to be as follows:

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and non-members of the tribe . . . *Id,* Montana, —— U.S. at ——, 101 S.Ct. at 1257.

■ This Court does note that tribes may regulate non-members activities on their reservations, in particular in regard to consensual relationships through commercial dealing. *Id, Montana.* This authority does not extend to adjudication of bankruptcy rights of non-members even on Indian land, in this Court's opinion.

> Further, it has never been held that a consensual relationship with an Indian or a tribe will subject a non-Indian to civil liability in a tribal court. Civ.No. 80–750 H B at 7 *Id, UNC Resources, Inc.* at 363.

This matter is not "internal" as it involves the rights of a non-member Debtor and the rights of all of the other creditors. It is not essential to self-government as it involves creditor-debtor (contractual) relationships.

It can be argued that such holding as those cited immediately above are intended only as a shield to protect non-Indians from the jurisdiction of the tribal courts and not as a sword to inflict the jurisdiction of the federal courts onto the tribes. In the case at bar, that is not a relevant distinction. The debtor, Sandmar, and the Navajo Tribe have a genuine dispute which depends, for its resolution, upon a body of law applied in a neutral and competent forum.

In a recent Tenth Circuit case. *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes,* 623 F.2d 682 (10th Cir. (1980), the Court was faced with the jurisdictional question when a non-Indian sought to bring suit against Indian tribes for blocking the sole road from the lodge (owned by the non-Indian plaintiff) to the principal highway, thus preventing any access to the lodge. The Court, reiterating the internal versus external distinction which limits In-

dian sovereignty, held that the federal court had jurisdiction. Key to its ruling was the finding that:

> It is obvious that the plaintiffs in this appeal have no remedy within the tribal machinery nor with tribal officials in whose election they cannot participate. *Id*, at 685.

There, as in the case at bar, there was no other forum where the dispute could be settled.

The Navajo Nation has no body of bankruptcy law. Having no body of law, the Tribal courts have no legal basis for resolving this dispute.

Title 11 of the United States Code embodies the totality of the law on the subject of bankruptcy throughout the United States. This body of law was enacted pursuant to Article I, Section VIII, Clause IV, of the United States Constitution which reserved to Congress the power to enact uniform laws on the subject of bankruptcy.

Chapter 28, Section 1471 of the United States Code, spells out the jurisdiction of the federal bankruptcy courts. The bankruptcy court for the District in which a case under Title 11 is commenced exercises all of the jurisdiction conferred upon the District Courts. This includes original and exclusive jurisdiction of all cases under Title 11 and original but not exclusive jurisdiction of all civil proceedings arising under Title 11. Further, sub-section (e) of 28 U.S.C. § 1471 states, "The bankruptcy court in which a case under Title 11 is commenced shall have exclusive jurisdiction of *all of the property, wherever located,* of the debtor, as of the commencement of such case." (Emphasis added).

To conclude this point, this case does not involve an internal matter but rather a dispute between the tribe and the non-Indian debtor, Sandmar, involving a comprehensive and uniform Federal Law. The Tribe has conceded it has no bankruptcy laws and has never previously handled any bankruptcy in any of its courts. The only forum for resolution of this dispute is the United States Bankruptcy Court.

The Tribe, by its counsel, suggested that this was a purely tribal matter and that the Navajo Tribe could pass its own bankruptcy law, and administer its own bankruptcy law in its own court system. Counsel for the Tribe however, indicated that to date the Navajo Tribe had never enacted its own bankruptcy law and no evidence was proffered that any other tribe had ever done so. Counsel further represented that these matters concerning financial problems on the reservation had in the past always been resolved by negotiation with the Tribe and that to his knowledge the Tribe had never before in its entire history been subjected to bankruptcy court jurisdiction. Both counsel further confessed no prior case authority concerning Indian tribes involvement in bankruptcy matters could be found.

This Court cannot agree with Respondent that each Indian tribe within this country could enact a separate bankruptcy law. This would frustrate the uniformity suggested by the Constitution. Further, despite the fact that apparently there is no case law, in the event settlement of these financial disputes is not achieved, the question of what court would have jurisdiction is not answered. If it be the Tribal Court, what law does it follow since admittedly it has no bankruptcy law.

It should further be noted that the Navajo Tribe has voluntarily, by subjecting itself to this Court's jurisdiction and has requested relief in these proceedings by filing a Notice of Representation for the Navajo Nation by Vlassis & Ott on February 3, 1981, and by filing their proof of claim in this case on March 9, 1981, with the federal bankruptcy court in this case.

It is true that these pleadings were filed after the violation of the automatic stay. While it can be argued that the waiver affects only those actions by the tribe which occurred subsequent to the Tribe entering the case in federal court, this Court notes that the Tribe remains in possession of the Debtor's property at this time, long after their waiver of immunity by virtue of the filing.

This Court is aware that the term Indian territory is used in the Bankruptcy Act of July 1, 1898, 30 Stat. 544, 11 U.S.C. § 1(24), but there is no such reference within the Bankruptcy Code, per se. There is no explanation in the history for this omission.

Finally, the tribe makes an argument related to the sovereign immunity question. The Navajo Nation claims that the tribe is exempt from the operation of 11 U.S.C. § 362 by virtue of their status as a governmental entity. While we may grant that the Tribe is a governmental entity, section 362 provides no such blanket exemption. Presumably, the Tribe is relying on sub-section (b)(4) of 11 U.S.C. § 362 which exempts governmental units *exercising their police powers as regulatory power*. The eviction of a Debtor in default of a lease is not the exercise of the tribe's police or regulatory power.

The stay provided by 11 U.S.C. § 362 applies to any "entity." The term entity includes a governmental unit. 11 U.S.C. § 101(14).

## 2. *CONTEMPT*

Given that this Court has jurisdiction to hear this case, the remaining issue is whether the Navajo Tribe, in the person of its agents, had the requisite state of mind to be held in contempt. The Navajo Nation argues that the standard for contempt is a knowing, willful and deliberate violation of the Court's Order. Their argument is that even if they were mistaken in their understanding that 11 U.S.C. § 362 did not apply to Indian Tribes, that their belief that they were immune prevents their action from being a deliberate, willful violation. They further argue that since they had no actual knowledge of the filing of the petition, that their action was not a knowingly willful and deliberate violation.

■ The second part of this argument can be dispensed with summarily. By the testimony of the Tribe's attorney, Michael Tang, it was established that the tribal offi-cers were told of the filing of the Chapter 11 petition on the night of January 19, 1981, immediately prior to the repossession. The Tribe had actual notice at that time. No more formal notice is required.

When an entity takes an action in violation of the automatic stay provision of the bankruptcy laws with knowledge of the filing of a bankruptcy petition and the consequent automatic stay, the creditor is in contempt. It is no defense that the creditor did not receive formal notice from the court. [Citations omitted]. Nor is it a defense that the creditor relied on the advice of counsel. *In re Eisenberg*, 3 C.B.C.2d 440, 448 (E.D.N.Y.1980).

This rule is supported by *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 52 (2d Cir.1976), in which the Court stated:

A person is in contempt of court if he knowingly violates a court order, whether or not he receives formal notice. The cases do not require contemnors to receive formal notice if they have actual notice of the court's order.

Thus, it being clear that the Tribe had actual knowledge and it being clear from case law that no additional notice was required, we are left with the other contention of the Tribe, that because they believed their actions were within the protection of sovereign immunity, those actions were not willful, deliberate violations of the stay. The only question here is whether the belief itself prevented the Tribe from having the requisite state of mind for contempt.

The state of mind necessary depends upon whether the Court is to find civil or criminal contempt.

Contempt, in this case, could be characterized as both civil and criminal. This Court is without the power to find criminal contempt for actions not committed in its presence, 28 U.S.C. § 1481.[1]

This Court does, of course, have the power to find civil contempt in this case. A

---

1. This Court can, however, certify this case to the District Court for a determination of the criminal contempt issue.

finding of civil, as opposed to criminal, contempt is appropriate here since a key purpose for such a finding is to preserve the rights of Sandmar which is at present unable to formulate a reorganization plan in this Chapter 11 proceeding as a direct result of the precipitous act of the Navajo Tribe.

The Navajo Tribe cites *Yablonski v. United Mine Workers of America*, 307 F.Supp. 1226, 1227 (D.D.C.1969), for the proposition that the appropriate standard for contempt is a knowing and willful state of mind.

Counsel for Sandmar argues correctly that civil contempt does not require willfulness to be actionable. *United States v. Greyhound*, 363 F.Supp. 525, 570 (N.D.Ill. 1973); *Powell v. Ward*, 487 F.Supp. 917 (S.D.N.Y.1980); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *National Labor Relations Board v. Lawley*, 182 F.2d 798 (5th Cir. 1950).

*Yablonski* is a civil case. The quotation apparently relied upon by the Tribe is:

In the proper case where plaintiff can establish his burden of proof to show by clear and convincing evidence knowing willful and deliberate violation of this Court's order, this court should not hesitate to invoke its contempt power 307 F.Supp. at 1227.

The Court in *Yablonski* did not find contempt. The above quotation is dicta which does not purport to identify the minimum requirements for contempt, but rather, states that when the intent is clear, there should be no hesitation in finding contempt.

The evidence is uncontradicted that the Tribe violated the stay provided by 11 U.S.C. § 362. When a debtor files a petition in bankruptcy the stay of proceedings as provided by 11 U.S.C. § 362 is automatic. On January 19, 1981, the Tribe knowingly violated the automatic stay in effect with regard to Sandmar property. Even prior to that date, the Tribe through its agents at least suspected that bankruptcy had been filed, but instead deliberately avoided actual notice. The action in forceably obtaining possession of Debtor's property is sufficient for a finding of civil contempt without a showing of willfulness.

In summary, this Court concludes that the Bankruptcy Code is applicable to Indian Tribes; and the United States Bankruptcy Court is empowered by Congress under the new Bankruptcy Code and jurisdictional statutes, has exclusive jurisdiction to determine all bankruptcy issues, and all issues related to any bankruptcy, between an Indian Tribe and a non-Indian Debtor. This statutory authority, specifically the automatic stay provided by 11 U.S.C. § 362, does apply to Indian Tribes.

The Court finds the Navajo Tribe in contempt for its deliberate violation of the automatic stay provided by 11 U.S.C. § 362, and will direct the Tribe to forthwith return all assets of the Debtor-in-Possession and to provide an accounting of its financial activity while in possession.