In re Richard D. **GREENE** and Donna J. Greene, husband and wife, Debtors,

Ross **RICHARDSON**, Chapter 7, Trustee–Appellee,

v.

**MT. ADAMS FURNITURE**, Defendant–Appellant.

No. 91–35491.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1992.

Decided Nov. 25, 1992.

R. Wayne Bjur and Tim Weaver, Cockrill, Weaver & Bjur, Yakima, Wash., for defendant-appellant.

Ross P. Richardson, Henningsen, Vucurovich & Richardson, Butte, Mont., for trustee-appellee.

Before: ALARCON, RYMER, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

Mt. Adams Furniture, a wholly-owned and operated business of the Yakima Indian Nation, appeals the district court's rejection of its claim of sovereign immunity in a bankruptcy proceeding imposing a judgment for preferential transfer by the debtor to Mt. Adams Furniture. We hold that the Yakima Indian Nation is immune from the suit by the trustee and reverse the district court.

FACTS AND PROCEDURAL HISTORY

Mt. Adams Furniture ("Mt. Adams") is a wholly-owned and managed enterprise of the Confederated Tribes and Bands of the Yakima Indian Nation ("Yakima Nation" or "Yakimas") with its place of business on

the Yakima Indian Reservation at Wapato in the State of Washington. Mt. Adams sold furniture to Richard D. and Donna J. Greene (dba Custom Carpets) in Townsend, Montana. The stipulated facts indicate that title to the goods passed to the Greenes, and Mt. Adams had no security interest in the furniture.

Mt. Adams peaceably repossessed the furniture when the Greenes did not pay for it and took it back to Wapato. When the Greenes filed for relief under Chapter 7 of the Bankruptcy Code within ninety days, the repossession became a preferential transfer. Richardson, the trustee, filed an adversary proceeding to set aside the preferential transfer. Mt. Adams appeared, and claimed to be immune from suit. Based on the stipulated facts, the bankruptcy court rejected Mt. Adams' claim of immunity, and directed entry of judgment against Mt. Adams in the amount of $8,779. The bankruptcy court order was affirmed by the district court and this appeal followed.

## DISCUSSION

### I

■■■ The Yakima Nation argues here, as it did in the courts below, that it is a sovereign by reason of its original status as a sovereign (citing *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). It is possessed of "the common-law immunity from suit traditionally enjoyed by sovereign powers, ... subject to the superior and plenary control of Congress.... [A] waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978) (internal quotes and citations omitted). With these propositions we can, and indeed must, agree. However, they will not readily decide the question before us.

We turn first to the decision of the bankruptcy court affirmed by the district court. The bankruptcy court dealt initially with the question of whether it had to defer to tribal court for determination of the claims involving the Yakima Nation, under *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). Since the Yakima Nation did not contend there, or here, that this is a case requiring deference to tribal court but rather argues only that it is entitled to immunity from the suit, we need not discuss the issue of tribal court jurisdiction.

The bankruptcy court also held that Mt. Adams did not enjoy tribal immunity: "Furthermore, the Supreme Court has consistently held that the immunity enjoyed by the tribe is not enjoyed by individual members (non-tribal officials) and businesses" (citing *Puyallup Tribe, Inc. v. Washington Game Dept.*, 433 U.S. 165, 171–73, 97 S.Ct. 2616, 2620–21, 53 L.Ed.2d 667 (1977) (*Puyallup III*)).

If only it were that easy. *Puyallup III* was a review of a judgment entered by the courts of the State of Washington. The state court judgment being reviewed recited that the court had jurisdiction to "regulate the fishing activities of the Tribe both on and off its reservation...." *Id.* at 167, 97 S.Ct. at 2618. The Supreme Court summarized its holding on the Tribe's claim of sovereign immunity as follows: "We hold that insofar as the claim of sovereign immunity is advanced on behalf of the Tribe, rather than the individual defendants, it is well founded...." *Id.* at 167–68, 97 S.Ct. at 2619.

Although the Court went on to point out that the doctrine of tribal immunity did not immunize individual members of the tribe (*id.* at 171–72, 97 S.Ct. at 2621), it did not distinguish between tribal immunity off and on the reservation. Nor did it have any occasion to discuss immunity of businesses owned and managed directly by the Tribe itself. Therefore, *Puyallup III* not only does not support the bankruptcy court's analysis, the failure of the Supreme Court to distinguish between the Tribe's on and off reservation immunity can be argued as at least an implicit recognition that tribal immunity does not disappear at the boundaries of the reservation.

## II

The Mt. Adams business venture involved a commercial business operated directly by the Yakimas for profit purposes, selling furniture to people located off the reservation. The first question then becomes whether tribal immunity attaches to such an enterprise.

▮ Arizona courts have considered the immunity of a "subordinate economic enterprise," which is a tribally-owned and operated business such as Mt. Adams here. The courts of Arizona hold such enterprises to be immune from suit for torts, even when the enterprise operates outside tribal boundaries. *Morgan v. Colorado River Indian Tribe*, 103 Ariz. 425, 443 P.2d 421 (1968). This rule was extended to suits based on breach of contract in *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971).[1]

The courts of New Mexico have considered and rejected the Arizona approach. In *Padilla v. Pueblo of Acoma*, 107 N.M. 174, 754 P.2d 845 (1988), *cert. denied*, 490 U.S. 1029, 109 S.Ct. 1767, 104 L.Ed.2d 202 (1989), the Pueblo was doing business as a roofing contractor on off-reservation projects. The New Mexico Supreme Court rejected the Pueblo's claim of immunity, saying:

> Having found no provision under the supreme law of the land that prohibits a state's exercise of jurisdiction over sovereign Indian tribes for off-reservation conduct, we believe the exercise of jurisdiction over a sovereign Indian tribe for off-reservation conduct is solely a matter of comity. It is the policy of New Mexico to allow breach of written contract actions against the state. Therefore, we hold that, regardless of where the contract was executed, the district court may exercise jurisdiction over an Indian tribe when the tribe is engaged in activity off the reservation as an unincorporated association registered and authorized to do business in this state and is sued in that capacity for breach of a written

contract to pay for the performance of contractual obligations accomplished or intended to be accomplished in connection with this off-reservation activity of the tribe.

754 P.2d at 850–51 (internal citation omitted).

▮ The *Padilla* case starts by recognizing the general rule that tribal immunity is immunized from diminution by the states. 754 P.2d at 847 (citing *Three Affiliated Tribes v. Wold Eng'g*, 476 U.S. 877, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986)). It ends by stating, as quoted above, that since no provision has been found which *prohibits* state jurisdiction over tribes for off reservation activities, New Mexico could exercise such jurisdiction as a matter of comity. *Id.* at 850.

At first reading, the New Mexico court seems to have changed hands with the sword. Yet, it started its discussion of tribal immunity with the phrase: "Where a tribe's sovereign immunity obtains ..." (*id.* at 847), implying that the first inquiry is to determine whether tribal immunity exists in general, although it undertook no analysis of that question.

Tribal immunity has been described as "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara*, 436 U.S. at 58, 98 S.Ct. at 1677. A necessary first step in the analysis is determining the scope of sovereign immunity at the common law.

In *Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), the case relied on by *Padilla*, the Supreme Court reviewed sovereign immunity at the common law. It noted there were two concepts involved, "one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign." *Id.* at 414, 99 S.Ct. at 1185.

As far as the second concept is concerned, the Court determined that immunity of one sovereign in the courts of another was a question answered under the law of

---

**1.** *See also, North Sea Products, Ltd. v. Clipper Seafoods Co.*, 92 Wash.2d 236, 938 (1979) (en banc) (a tribe does not waive its immunity from garnishment by engaging in commercial activities off the reservation).

the sovereign providing the forum. The Court acknowledged that the extent to which comity would be extended between sovereigns had changed over the years.

> It is fair to infer that if the immunity defense Nevada asserts today had been raised in 1812 when *The Schooner Exchange* [11 U.S. 116, 7 Cranch 116, 3 L.Ed. 287] was decided, or earlier when the Constitution was being framed, the defense would have been sustained by the California courts.

*Id.* at 417, 99 S.Ct. at 1186.

. The question in *Hall* was whether there was a constitutional impediment to California's application of its own law as it existed in 1968, when the accident occurred, or whether it had to apply "the sovereign immunity doctrine as it prevailed when the Constitution was adopted." *Id.* at 418, 99 S.Ct. at 1187. The Court's discussion of the doctrine as it evolved from the early days of the Republic makes it clear that the states, and the United States, have greatly changed their views of sovereign immunity over the years. In holding there was no Constitutional hindrance to the states' doing so, the Court left the extent of immunity between states to be resolved by the law of those states. But that discussion also recognized that immunity between sovereigns at the common law was much broader than it is now, particularly as it relates to commercial enterprises.[2]

> The Court said in a footnote:

> Such a defense was sustained in 1929 by the Supreme Court of North Dakota in *Paulus v. South Dakota*, 58 ND 643, 647–649, 227 NW 52, 54–55. The States' practice of waiving sovereign immunity in their own courts is a relatively recent development; it was only last year, for example, that Pennsylvania concluded that the defense would no longer be recognized, at least in certain circum-

stances, in that State. [citations omitted] But as States have begun to waive their rights to immunity in their own courts, it was only to be expected that the privilege of immunity afforded to other States as a matter of comity would be subject to question.

Similarly, as concern for redress of individual injuries has enhanced, so too have moves toward the reappraisal of the practices of sovereign nations according absolute immunity to foreign sovereigns. The governing rule today, in many nations, is one of restrictive rather than absolute immunity.

*Id.* at 418, n. 13, 99 S.Ct. at 1186 n. 13.

■■■■ Congress reflected the restrictive view of sovereign immunity when it adopted the Foreign Immunities Act of 1976 (28 U.S.C. § 1602 *et seq.*) The Act specifically eliminated the sovereign immunity of foreign states involved in commercial activity within the United States. [28 U.S.C. § 1605(a)(2) ][3]

■■■ The actions of the states and the United States in limiting their own immunity, and the action of Congress in limiting the immunity of foreign states underscore the original scope of sovereign immunity. Against this background of nearly two hundred years of recognizing sovereign immunity's extra-territorial reach, and the repeatedly recognized necessity of specific congressional action to limit tribal sovereign immunity, congressional silence on the issue of Indian tribal immunity is a compelling, if not controlling, factor. Since only Congress can limit the scope of tribal immunity, and it has not done so, the tribes retain the immunity sovereigns enjoyed at common law, including its extra-territorial component.

If there were error in the *Padilla* court's analysis, it was in failing to recognize that the scope of tribal immunity in the courts

---

2. *See* Note, *Sovereign Immunity of States Engaged in Commercial Activities,* 65 COLUM.L.REV. 1086 (1965), for a discussion of the development of the restrictive doctrine of sovereign immunity. That doctrine does not recognize sovereign immunity for commercial activities carried on by a foreign state.

3. From Congress' adoption of the Foreign Immunities Act, we can imply at least two things:
 a. It takes an act of Congress to effectively limit the sovereign immunity of a foreign sovereign; and
 b. Congress knows how to limit the sovereign immunity of others when it wants to.

of New Mexico was not wholly a question of New Mexico law. As the *Padilla* court itself noted, "[a]bsent federal authorization, tribal immunity is privileged from diminution by the states." 754 P.2d at 847. Thus, the court should have looked at the scope of tribal immunity under federal law, rather than the extent of comity afforded under state law.

■ The issues involved in the *Padilla* case are not before us, and we discuss it here only for the purpose of making the point that the scope of tribal immunity has to be measured at the common law as it existed at some earlier time,[4] rather than adopting present limits on sovereign immunity accepted by the states for their own purposes.

Before we leave the question of Yakima Nation's sovereign immunity, we need to look at two lines of Supreme Court cases for possible impact on our analysis. The Court has analyzed tribal sovereignty issues under either a pre-emption analysis or a dependent status analysis. We will examine each of these in turn.

Federal pre-emption was first stated as the basis for resolving issues of state authority over activities on reservations in *McClanahan v. Arizona Tax Commission,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973) ("the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption"). This approach has been used by the Court in cases involving state efforts to tax activities on the reservation, as in *McClanahan* itself,[5] as well as cases where the state is attempting to regulate activities on the reservation, such as by licensing the sale of liquor,[6] or by applying state statutes regulating bingo.[7]

■ Almost by definition, application of the pre-emption analysis is limited to situations where the state itself is seeking to tax or regulate conduct on the reservation. If there is no attempted state action, there is nothing to be pre-empted. Here, there is no state action proposed, so the pre-emption cases do not affect our analysis.

The other approach the Court has used is to look at the tribe's dependent status and determine how that might affect the tribe's ability to do what it proposes to do. The Court noted in *Washington v. Confederated Tribes,* 447 U.S. 134, 153–54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1976):

> Tribal powers are not implicitly divested by virtue of the tribes' dependent status. This Court has found such a divestiture in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights.

The Court said in *United States v. Wheeler,* 435 U.S. at 326, 98 S.Ct. at 1087:

> Moreover, the sovereign power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status. The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy.... They cannot enter into direct commercial or governmental relations

---

4. Contemporaneously with Senate ratification of the Treaty with the Yakimas in 1859 (12 Stat. 951), the Supreme Court said, "[i]t is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission...." *Beers v. Arkansas,* 61 U.S. (20 How.) 527, 529, 15 L.Ed. 991 (1857).

5. *See, e.g., Washington v. Confederated Tribes,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

6. *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983).

7. *California v. Cabazon Band of Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

with foreign nations.... [T]hey cannot try nonmembers in tribal courts.

(Citations omitted.)

▉ In a general sense, a claim of tribal sovereign immunity involves external relations of the tribe. However, the dependent status of the tribes has been a factor in the analysis of tribal sovereignty where the tribe is affirmatively asserting its authority, whether to sell land, to deal directly with foreign governments, or try nonmembers in tribal courts. An assertion of sovereign immunity is not an affirmative act of the tribe, in the sense involved in the dependent status cases. It is, instead, a claim of status arising from sovereignty itself. Whether for this reason or others, the dependent status analysis has not been used by the Supreme Court in cases involving claims of tribal immunity.

▉ As we analyze this somewhat confusing area of Indian tribal jurisprudence, we conclude that pre-emption analysis comes into play when a state tries to regulate or tax activities on an Indian reservation. The dependent status of the tribes becomes a factor when a tribe is affirmatively asserting its sovereignty in dealing with its property or with non-tribal members. Neither is involved when a wholly-owned tribal enterprise doing business on the reservation claims tribal immunity from a suit which is the result of a private commercial transaction. Tribal immunity from suit arises from the Government's recognition that Indian tribes possess the attributes of a common law sovereign, and neither pre-emption nor dependent status analyses have been stated by the Supreme Court to affect that status.

The distinction between tribal sovereignty in general and tribal immunity from suit is reflected in the result in *Oklahoma Tax Comm'n v. Potawatomi Tribe*, 498 U.S. 505, ——, 111 S.Ct. 905, 909–10, 112 L.Ed.2d 1112, 1120 (1991). Oklahoma sought to impose its cigarette tax on cigarettes sold by the Tribe in its convenience store located on trust lands. The Court held that Oklahoma could impose its tax on cigarettes sold to non-tribal members, and that the Tribe could be required to collect

the tax. *Id.* at ——, 111 S.Ct. at 911, 112 L.Ed.2d at 1122. The Court further held that tribal immunity prevented the state from collecting the tax on sales to tribal members and from suing the Tribe to collect amounts due. *Id.* Even though tribal sovereignty did not prevent the state from imposing a duty to collect the tax on the Tribe, tribal immunity prevented the state from suing to collect the amounts due.

In *Potawatomi*, Oklahoma contended that tribal sovereignty should be limited to tribal courts and the internal affairs of tribal government because "tribal business activities ... are now so detached from traditional tribal interests that the tribal sovereignty doctrine no longer makes sense in this context," and because "no purpose is served by insulating tribal business ventures from the authority of the States to administer their laws." *Id.* at ——, 111 S.Ct. at 910, 112 L.Ed.2d at 1120. In rejecting Oklahoma's argument, the Court said:

> Congress has always been at liberty to dispense with such tribal immunity or to limit it. Although Congress has occasionally authorized limited classes of suits against Indian tribes, it has never authorized suits to enforce tax assessments. Instead, Congress has consistently reiterated its approval of the immunity doctrine.... These Acts reflect Congress' desire to promote the "goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development.... Under these circumstances, we are not disposed to modify the long-established principle of tribal sovereign immunity.

*Id.* at ——, 111 S.Ct. at 910, 112 L.Ed.2d at 1120–21 (citations omitted).

▉ We conclude from the above analysis that sovereign immunity, as it existed at common law, had an extra-territorial component. "The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance." *Wold*, 476 U.S. at 891, 106 S.Ct. at 2313. Congress has not acted to limit the reach of this element of tribal

sovereignty, so there is no general impediment to the existence of the immunity claim by the Yakima Nation.

### III

We turn now to this specific case. The trustee filed an adversary proceeding against a wholly-owned business of the Yakima Indian Nation. Is there anything in the Bankruptcy Code which evidences an intention to subject Indian tribes to bankruptcy court jurisdiction?

 "The trustee is a representative of the estate, not an officer, agent or instrumentality of the United States." *In re Hughes Drilling Co.*, 75 B.R. 196, 197 (Bankr.W.D.Okla.1987). Thus, the Yakimas' lack of immunity to suit by the United States itself (*United States v. Yakima Tribal Ct.*, 806 F.2d 853, 861 (9th Cir.1986); *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987)) does not render it amenable to suit by the trustee.

 The trustee argues that two separate sections of the Bankruptcy Code operate as a waiver of sovereign immunity. The first is 11 U.S.C. § 106:

(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections(a) and (b) of this section and notwithstanding any assertion of sovereign immunity—

(1) a provision of this title [11 USCS §§ 101 et seq.] that contains "creditor", "entity", or "governmental unit" applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

"Governmental Unit" is defined in section 101(24) as follows:

"[G]overnmental unit" means United States, State; Commonwealth; District; Territory; municipality; foreign state; department, agency or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

Since subsections (a) and (b) relate to situations in which a sovereign has filed a claim in the bankruptcy proceedings, which the Yakima Nation did not, we are left with § 106(c). The Supreme Court has interpreted the effect of § 106(c) in two cases, which compel rejection of the trustee's arguments here.

In *Hoffman v. Connecticut Dept. of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), the trustee sought a money judgment against a state. Four members of the Court interpreted § 106(c) to authorize only injunctive or declaratory relief against a state because of the language that governmental units are bound by resolution of "issues" rather than "claims." *Id.* at 102, 109 S.Ct. at 2823. Justice Scalia believed the Congress lacked authority to abrogate the states' immunity to money judgment actions under the Eleventh Amendment, thus making up the majority for its holding that a money judgment could not be obtained against a state under § 106(c). *Id.* at 105, 109 S.Ct. at 2824.

In the recent case of *United States v. Nordic Village, Inc.*, 501 U.S. ——, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), the Court held that § 106(c) did not waive the immunity of the United States to suit for a money judgment. The Court construed § 106(c) as not being an unequivocal waiver of government immunity to suits for money judgments. *Id.* at ——, 112 S.Ct. at 1017. For example, § 106(c) would permit the bankruptcy court to bind the government on the amount of the estate's liability for unpaid taxes. *Id.* If we assume, without deciding, that Indian tribes are "governmental units" for the purposes of § 106, then the waiver of sovereign immunity accomplished by § 106 does not extend to

actions for money damages against Indian tribes.

Second, the trustee relies on the case of *In re Sandmar Corp.*, 12 B.R. 910, 915 (Bankr.D.N.M.1981). That court found jurisdiction over the Navajo Nation based in part on the exclusive jurisdiction of the bankruptcy court over the property of the bankrupt estate in a Chapter 11 case, citing 28 U.S.C. § 1471(e). To the extent the trustee here makes a similar argument under 28 U.S.C. § 1334(d),[8] the argument has no merit. In *Nordic Village*, the Supreme Court specifically rejected this contention as it applied to the United States. The Court said:

> In *Blatchford v. Native Village of Noatak*, 501 U.S. ——, —— [111 S.Ct. 2578, 2583, 115 L.Ed.2d 686] (1991) (slip op., at 10), the argument was made that Alaska's Eleventh Amendment immunity to suit was abrogated by 28 U.S.C. § 1362, a jurisdictional grant, akin to § 1334(d), that gives district courts jurisdiction over "all civil actions, brought by any Indian tribe ... aris[ing] under the Constitution, laws, or treaties of the United States." Rejecting that contention, we observed: "The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim. The issues are wholly distinct." *Id.*, at ——, n. 4, 111 S.Ct. at 2585 n. 4 (slip op., at 10, n. 4).

*Nordic Village*, —— U.S. at ——, 112 S.Ct. at 1017 (emphasis in original).

The bankruptcy court's jurisdiction over the property of the estate, and its jurisdiction to hear adversary proceedings, does not operate to pierce the Yakima Nation's immunity from suit.

## CONCLUSION

Cases involving tribal sovereignty have usually come up in the context of a conflict between a state's authority and the sovereignty of a tribe. For that reason, we have discussed those cases, even though a claim of state authority is not involved here. Cases which do involve such a claim may well require a different analysis than we have employed, and we do not intend to foreclose any such approach.

There is language in Supreme Court cases, such as *Wheeler*,[9] and *Mescalero Apache Tribe v. Jones*,[10] which raises some question about tribal authority, and perhaps immunity, off the reservation. However, the Court has recently, and emphatically, reaffirmed the validity of the tribal immunity doctrine in *Potawatomi*. Given the Court's demonstrated concern for protecting tribal opportunities for economic development,[11] we believe the Court would hold that tribal immunity does not stop at the reservation boundaries, at least in a case such as this.

**REVERSED** and **REMANDED** with instructions to dismiss the adversary proceeding.

RYMER, Circuit Judge, concurring:

I agree with my colleagues that the tribe's sovereign immunity bars this action under either theory argued by the parties—that the bankruptcy court's exclusive jurisdiction abrogates tribal sovereign immunity and that 11 U.S.C. § 106(c) effects

---

8. 28 U.S.C. § 1334(d) provides:
 The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of the estate. (Internal citation omitted).

9. *Wheeler*, 435 U.S. at 326, 98 S.Ct. at 1087. "The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe."

10. 411 U.S. 145, 149, 93 S.Ct. 1267, 1271, 36 L.Ed.2d 114 (1973). "But tribal activities conducted outside the reservation present different

considerations." *See also Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981). "But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation."

11. "Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members." *Cabazon Band*, 480 U.S. at 219, 107 S.Ct. at 1093.

a waiver of that immunity. In framing the issues this way, however, both parties assume that the scope of tribal immunity was locked in at the time the treaty with the Yakima Nation was ratified and can only be changed by Congressional action; the immunity enjoyed by other sovereigns, however, is subject to evolution through the common law. As it has evolved, the immunity of a foreign state is limited to its public acts and does not extend to suits based on its commercial or private acts. I write separately to note that we have never squarely addressed the question whether the law on sovereign immunity of an Indian nation is similarly developed. It is not an easy question to resolve, and I am not so persuaded as the majority appears to be that "the scope of tribal immunity has to be measured at the common law as it existed at some earlier time." Since this point was not directly briefed in this case, I do not believe we can answer it authoritatively. I therefore understand the majority's opinion to reach no further than the issues actually raised.

As the Supreme Court pointed out in *Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), the immunity of a sovereign in the courts of another sovereign is controlled by the law of the forum state. *Id.* at 416–17, 99 S.Ct. at 1186. The old rule of sovereign immunity under United States law was one of absolute immunity. In *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), Chief Justice Marshall stated that the

> perfect equality and absolute independence of sovereigns ... have given rise to a class of cases in which every sovereign is understood to waive a part of that complete territorial jurisdiction, which has been stated to be the attribute of every nation.

*Id.* 11 U.S. at 137. This rule of absolute immunity was followed by the Supreme Court into the twentieth century. *See Berizzi Bros. Co. v. S.S. Pesaro*, 271 U.S. 562, 568, 46 S.Ct. 611, 70 L.Ed. 1088 (1926) ("A real sovereign, a state, a nation, is always sovereign. In none of its activities is it

ever subject to a higher human will, individual or collective.").

Sovereign immunity, like other legal concepts, is capable of evolution. *See Nevada v. Hall*, 440 U.S. at 417–19, 99 S.Ct. at 1186–87. Even before the Supreme Court's decision in *Berizzi Brothers*, the State Department had favored the restrictive view, which limits immunity to the noncommercial activities of a foreign sovereign. *See* David A. Brittenham, Note, *Foreign Sovereign Immunity and Commercial Activity: A Conflicts Approach*, 83 Colum.L.Rev. 1440, 1452 (1983). The Supreme Court implicitly adopted the restrictive view in the early 1940's by agreeing to adhere to the policy opinions of the State Department. In *Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945), the Court stated:

> It is ... not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize.

*Id.* at 35, 65 S.Ct. at 533. *See also Ex parte Peru*, 318 U.S. 578, 586–87, 63 S.Ct. 793, 799, 87 L.Ed. 1014 (1943); *Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir.1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). In 1952, the State Department officially announced in the Tate Letter (letter from Jack B. Tate, Acting Legal Adviser of the U.S. Dep't of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't St.Bull. 984 (1952)) that it would be "the Department's policy to follow the restrictive theory of sovereign immunity." *Id.*

By enacting the Foreign Sovereign Immunities Act of 1976 (FSIA), Pub.L. 94–583, 90 Stat. 2891 (1976), Congress adopted the restrictive view of sovereign immunity. The House of Representatives report on the FSIA stated that

> the bill would codify the so-called "restrictive" principle of sovereign immunity, *as presently recognized in international law.* Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's

public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).

House Report (Judiciary Committee) No. 94–1487 (Sept. 9, 1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605 (emphasis added). Since the enactment of the FSIA, the scope of the commercial exception that it codifies has been extensively litigated in the federal courts. *See, e.g., Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (breach of contract action involving bonds issued by Argentine national bank); *Compania Mexicana de Aviacion, S.A. v. United States Dist. Court,* 859 F.2d 1354 (9th Cir.1988) (tort action against Mexican state airline).

The common law sovereign immunity among the states has also evolved. In *Nevada v. Hall,* a California resident had sued the State of Nevada in California court to recover damages arising from an automobile accident with an employee of the University of Nevada. 440 U.S. at 419, 99 S.Ct. at 1187. The Supreme Court upheld the California court's rejection of Nevada's sovereign immunity defense, even though it noted that "when *The Schooner Exchange* was decided, or earlier when the Constitution was being framed, the defense would have been sustained by the California courts." *Hall,* 440 U.S. at 417, 99 S.Ct. at 1186.

Tribal sovereign immunity, such as that asserted by the Yakimas in this case, is not precisely the same as either international law sovereign immunity or sovereign immunity among the states:

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by

implication as a necessary result of their dependent status.

*United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). Indian sovereignty is further distinguished because of the importance, as the Supreme Court has emphasized, of "Congress' desire to promote the 'goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.'" *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe,* 498 U.S. 505, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991).

Yet the common law sovereignty of Indian tribes is not absolute. The *Wheeler* Court identified several areas in which tribal sovereignty has been circumscribed: Indians can no longer freely alienate the land they occupy to non-Indians, they cannot enter into direct relations with foreign nations, and they cannot try nonmembers in tribal courts. *See* 435 U.S. at 326, 98 S.Ct. at 1087. At the same time, "Indian tribes have long been recognized as possessing the common law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Because that common law sovereign immunity has evolved to be inapplicable to commercial activity by a sovereign and because such an exception is based on the important principle that it is disfavored for a commercial actor to escape the legal consequences of its actions, whether tribal sovereign immunity now extends to commercial activities is an important, complex, and unresolved question.[1]

---

**1.** No other court has directly confronted this question, either. Two recent opinions in other circuits have touched on the commercial exception recognized in the FSIA and commercial transactions of an Indian tribe. Neither, however, explicitly considers whether tribal sover-

eign immunity extends to commercial activities or is restricted by virtue of a tribe's dependent status or by virtue of evolution of the common law. In *Bank of Oklahoma v. Muscogee (Creek) Nation,* 972 F.2d 1166 (10th Cir.1992), the Tenth Circuit found unpersuasive an analogy to the

commercial exception in the FSIA in deciding that an interpleader action filed against an Indian tribe in connection with a dispute over a tribal bingo hall was barred by sovereign immunity. The Eighth Circuit held in *American Indian Agricultural Credit Consortium v. Standing Rock Sioux Tribe,* 780 F.2d 1374 (8th Cir.1985), that the commercial nature of a loan between a credit union and an Indian tribe did not effect an implied waiver of tribal sovereign immunity. *Id.* at 1378.

As Judge Nelson notes, state supreme courts have addressed the commercial exception, but with ambiguous results. *See, e.g., Dixon v. Picopa Constr. Co.,* 160 Ariz. 251, 772 P.2d 1104, 1109 (1989) (tribal sovereign immunity covers "tribal business" but not "non-tribal business," without definition); *Padilla v. Pueblo of Acoma,* 107 N.M. 174, 754 P.2d 845, 850 (1988) (tribal sovereign immunity does not cover economic activities by the tribe off the reservation), *cert. denied,* 490 U.S. 1029, 1030, 109 S.Ct. 1767, 1768, 104 L.Ed.2d 202 (1989). *See also Duluth Lumber and Plywood Co. v. Delta Development, Inc.,* 281 N.W.2d 377, 382 (Minn.1979) ("Generally, state courts may assume jurisdiction over disputes arising from commercial transactions between Indians and non-Indians if the transaction is not confined to the Indian Reservation."); *Atkinson v. Haldane,* 569 P.2d 151, 169–70 (Alaska 1977) (courts do not recognize "proprietary act/governmental function" test regarding tribal sovereign immunity); *North Sea Products, Ltd. v. Clipper Seafoods Co.,* 92 Wash.2d 236, 595 P.2d 938, 939, 942–43 (no commercial exception under existing law, but concurring justice suggests this rule is "unjust, unwise and unreasonable") (1979).

Although the United States Supreme Court has held that "without Congressional authorization the Indian nations are exempt from suit," *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *see Santa Clara Pueblo v. Martinez,* 436 U.S. at 58, 98 S.Ct. at 1677 (quoting *United States Fidelity & Guaranty,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940)), it has never directly considered the reach of tribal immunity in business ventures. Indeed, Justice White dissented from the denial of certiorari in *Padilla,* 490 U.S. at 1030, 109 S.Ct. at 1768, urging that the Court should have heard the case "to resolve the conflict among the state courts"; and Justice Stevens, concurring in *Potawatomi Tribe,* remarked that he was "not sure that the rule of tribal sovereign immunity extends to cases arising from a tribe's conduct of commercial activities off the reservation." *Id.,* 498 U.S. at —— 111 S.Ct. at 912 (citing the Foreign Sovereign Immunities Act).