In re DAVIS CHEVROLET,
INC., Debtor.

Lawrence J. Warfield, Chapter
7 Trustee, Plaintiff,

v.

The Navajo Nation, Defendant.

Bankruptcy No. B–97–
12542–PHX–GBN.
Adversary No. 01–01314.

United States Bankruptcy Court,
D. Arizona.

Aug. 29, 2002.

Jon S. Musial, Scottsdale, AZ, for plaintiff.

Marcelino R. Gomez, Assistant Attorney General, Navajo Nation Department of Justice, Window Rock, AZ, for The Navajo Nation.

MEMORANDUM OF DECISION

GEORGE B. NIELSEN, Jr.,
Bankruptcy Judge.

Plaintiff is the appointed chapter 7 trustee for the bankruptcy estate of Davis Chevrolet, Inc., a nonoperating automobile dealership located within the boundaries of the Navajo Nation ("Nation"), a federally recognized Indian tribe. Plaintiff brought suit against the Nation in the United

States Bankruptcy Court for the District of Arizona on December 17, 2001. Complaint count one seeks disallowance of two proofs of claim filed against the estate by the Nation on April 9, 1998. Count two seeks money damages against the Nation for alleged violations of Navajo business preference and procurement law.

The Nation has moved to dismiss the damages count of the complaint on the basis of sovereign immunity and failure to exhaust administrative and judicial remedies available through the Nation's judicial and administrative structure.

The court concludes that sovereign immunity has been waived. Further, there is no need to require exhaustion of remedies provided by Navajo law or regulation, prior to bringing suit in this forum. The motion to dismiss is denied.

A discussion of the facts and law underlying this decision follows.

## I.

■ "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998). *See also Pit River Home and Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir.1994) (" 'Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories. Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation.' ") *See also Dawavendewa v. Salt River Project Agricultural Improvement and Power District*, 276 F.3d 1150, 1159 (9th Cir.2002).

A recent case found an affirmative waiver of immunity by a tribe through its participation as a creditor in a bankruptcy. That waiver carried forward to a chapter 7 proceeding after the case converted from chapter 11. *Confederated Tribes of the Colville Reservation Tribal Credit v. White (In re White)*, 139 F.3d 1268, 1269 (9th Cir.1998).

In that case, Colville Tribal Credit filed an objection to a chapter 11 plan, arguing the plan had not been filed in good faith. The tribe also filed a ballot rejecting the plan. Once the plan was amended, the tribe filed another rejection ballot. 139 F.3d at 1270.

Upon conversion to chapter 7, Colville Credit filed an action contesting the dischargeability of its claim. *Id.* at 1270. The tribal entity argued sovereign immunity precluded the court from asserting jurisdiction over its claims and asked to be removed from the list of creditors. *Id.* The bankruptcy court declined, holding Colville's actions in the case were affirmative acts to collect a debt thereby waiving sovereign immunity.

The Ninth Circuit affirmed. "Colville Credit sought to collect its debt by actively participating in the reorganization court. It acknowledged that it had a claim, objected to confirmation of White's plan of reorganization because it thought it was entitled to more than the plan would have allowed, and it sought relief from the bankruptcy court in the form of an order denying confirmation. It twice voted against plans of reorganization. Having done this, Colville Credit ... 'waive[d] any immunity which it otherwise might have had respecting the adjudication of the claim.' " *Id.* at 1271.

## II.

In the present case, the trustee's first cause of action focuses on disallowance of the Nation's two proofs of claim, alleging the Nation entered into a lease with Don

and Eula Davis for rental of the location on which Davis Chevrolet conducted business. Debtor was allegedly not an obligor, borrower or otherwise a signatory to the leases and documentation submitted in support of the claims. As such, the Nation does not have a valid, enforceable claim against the bankruptcy estate, the trustee alleged.

The second cause of action seeks recovery of damages under the Navajo Business Preference Act and Navajo Business and Procurement Act (the "Acts"). Plaintiff alleges Davis commenced negotiations and submitted bids for sale of vehicles and service to the Nation as an eligible business entitled to business opportunity under the Acts. The Nation allegedly denied business opportunities exclusively available to Davis as the only preferred, eligible business under the Acts. The trustee alleges lost business opportunities in excess of $1 million on an annual basis. Complaint at 4.

Trustee alleges, upon information and belief, the Nation knowingly defied Navajo statutory law by granting to a non-Indian enterprise its retail parts and auto repair business, to debtor's financial detriment. Further, in the course of business, the Nation allegedly ordered vehicles through non-Indian owned enterprises. *Id.*

Finally, under the statutory provisions of the Acts, plaintiff claims the Nation was not justified or entitled to withhold or refuse to award business opportunities for the following reasons:

1. There was no outstanding money judgment in favor of the Nation against debtor or Davis.

2. There was no valid delinquent account receivable debt due and owing to the Nation from debtor or the owners.

3. Modifications to any alleged obligation of the Davis owners specifically noted continuing exemptions for vehicle sales transactions with various Navajo authorities. Even if the Davis owners became ineligible as a result of an alleged delinquent account receivable, no formal determination of ineligibility was rendered under Navajo law.

4. Even if there was an alleged basis for making an ineligibility determination, no such determination was made.

5. There was no determination based on evidence of default of materially deficient business practices or failure to meet a material contractual or financial obligation to the Nation to preclude or restrict the right of debtor to receive and maintain certification and advantages under the Acts.

6. There was no determination based on evidence of a failure to materially comply with applicable laws or material delay resulting in monetary or other detriment to the Nation that was not cured to preclude or restrict debtor's rights to receive and maintain certification.

7. There was no finding debtor or its owners engaged in unlawful or criminal actions or other activities that adversely reflected on the honesty and moral character of debtor and its owners.

8. There were no rules and regulations promulgated, as required under Navajo law. As a result of the failure to promulgate, adopt and administer rules and regulations to ensure equal protection, the Nation is allegedly subject to liability for violation of federal civil rights laws, as well as liability under the Navajo Bill of Rights. *Id.* at 5–7.

The trustee further alleged that as a direct result of the refusal to honor the preferences and opportunities available to Davis, he was unable to maintain his obligations to his franchisors and lost his dealership. As a result, debtor was damaged

in an amount believed to be not less than $5 million. *Id.* at 7.

■ As conceded by the Nation, there is no question that the bankruptcy court has jurisdiction to adjudicate the pending objections to the Nation's claims. Memorandum at 4. This case is not like *Richardson v. Mt. Adams Furniture (In re Greene),* 980 F.2d 590, 597 (9th Cir.1992), where the court held sections 106(a) and (b) of the Bankruptcy Code, (now 106(b) and (c)) [1] were inapplicable because the Yakima Nation had not filed a proof of claim. Here trustee is objecting to filed bankruptcy claims. This objection forms the basis of complaint count one. However, the trustee asserts that creditor's waiver of sovereign immunity regarding its claims extends to claims against creditor as well.

## III.

■ To determine whether the trustee's claims against a governmental unit arise out of the same transaction or occurrence as the claims filed by the governmental unit, courts apply the logical relationship test of Fed.R.Civ.P. 13(a). *Schulman v. State of California (In re Lazar),* 237 F.3d 967, 979 (9th Cir.2001); *cert. denied,* —— U.S. ——, 122 S.Ct. 458, 151 L.Ed.2d 377 (2001).[2] A logical relationship exists "when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the

claim rests activates legal rights otherwise dormant in the defendant." *Id.*

In *Lazar,* the California State Board of Equalization ("BOE") filed several proofs of claim against debtor. An unspecified portion of the claims were for underground storage tank ("UST") fees. The trustee became the holder of debtor's claims for reimbursement and damages. To determine whether the state was entitled to Eleventh Amendment immunity, the court had to determine whether claims for unpaid UST fees were logically related to the trustee's claims for UST fund reimbursement. *Id.*

The state board asserted that while its claims and the trustee's claims both involved debtor's maintenance of underground storage tanks, resolution involved wholly separate inquiries. *Id.* at 979–80. The Ninth Circuit disagreed, noting that creditor claims for unpaid fees and the trustee's reimbursement claims both concerned the state UST fund. Both arose out of activities associated with the same bankruptcy. While the BOE demanded payment of fees, the trustee sought reimbursement from the fund for corrective actions taken on the storage tanks. *Id.* at 980. Because BOE filed proofs of claim in the bankruptcy that arose out of the same transaction or occurrence as the trustee's claims against the board in the adversary, the state waived its immunity. *Id.* By contrast, the Ninth Circuit held that the BOE's non-UST fee claims were not logi-

---

**1.** Section 106(b) of Title 11, U.S.Code, provides that "a governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose."

Section 106(c) provides that "[n]otwithstanding any assertion of sovereign immunity

by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate."

**2.** Neither side quarrels with the proposition that the Nation is a governmental unit within the code. *See* Nation's memorandum at 5 and trustee's response at 7. 11 U.S.C. §§ 106(b), (c).

cally related to the Trustee's claims in the adversary. *Id.* at n. 12.

Cases cited by *Lazar* amplify the logical relationship needed. In one, Prudential Insurance sued a former employee alleging he appropriated confidential customer information obtained while employed by plaintiff. Later the employee sued Prudential, alleging Prudential defamed him and engaged in other wrongful conduct intended to damage his competing business. *Pochiro v. Prudential Insurance Company of America*, 827 F.2d 1246 (9th Cir.1987).

One issue was whether Pochiro's action should have been asserted in the earlier Prudential action as a compulsory counterclaim. The court noted that in the Prudential action, the "operative facts ... were that John Pochiro, when employed by Prudential, ... was given confidential records about Prudential's present and prospective policyholders.... [A]fter resigning, ... Pochiro failed to return the records ... and instead used them in soliciting business in competition with Prudential." *Id.* at 1250.

Pochiro's suit alleged that commencing in December, 1982 and January–February, 1983, Prudential deliberately, maliciously, willfully and/or with gross, wanton, and negligent conduct set about to substantially damage John's reputation, credibility and business; that Prudential's wrongful conduct included it doing the following acts: (1) Prudential told John's employees and/or prospective employees that John was a crook, and/or was dishonest and threatened them with litigation involvement or economic difficulty if they worked for John; (2) Prudential told insurance customers that John was a crook, dishonest and/or unscrupulous and that if they did business with him they would suffer losses; (3) Prudential encouraged one customer to file a complaint without justification, against John at the Arizona Insurance Commissioner; (4) Prudential used delay tactics in paying its own policyholders to prevent them from converting existing Prudential policies and doing business with John; (5) Prudential unjustifiably tried to pursuade (sic) other insurance companies not to do business with John; (6) Prudential abused the process of the Arizona court system by bringing a lawsuit against John for the ulterior purpose of using it as a tool to dissuade persons from doing business with John; (7) Prudential told customers of John that if they did business with him they would be involved in litigation; (8) Prudential in bad faith delayed and/or failed to make payments to John under John's own insurance policy with Prudential and stopped payment on at least one such check. *Id.*

While noting that some allegations initially appeared removed from Prudential's action to enjoin use of confidential records, the Court found Pochiro's use of Prudential's customer records was inextricably intertwined with the facts alleged in his complaint. *Id.* The court concluded that Pochiro's causes of action were compulsory counterclaims. 827 F.2d at 1250–53.

In another case cited by *Lazar*, debtor was certified by the state of Wyoming as a Disadvantaged Business Enterprise (DBE). Approximately one month after her bankruptcy filing, the Department of Transportation notified debtor of its intent to decertify her DBE status. *Wyoming Department of Transportation v. Straight (In re Straight)*, 143 F.3d 1387, 1389 (10th Cir.1998); *cert. denied*, 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998). The state's notification indicated Wyoming law required the Wyoming Department of Transportation to analyze the bonding and financial capacity of debtor's firm for eligi-

bility in the DBE program. By filing for chapter 13 bankruptcy, debtor supposedly lost the ability to control her business. *Id.*

The state decertified debtor. She filed a motion in bankruptcy court for an order to show cause for contempt. The court issued an order finding decertification violated the automatic stay and section 525(a) of Title 11. The court ordered payment of fees and costs. The district court affirmed, finding the Wyoming employment and safety division had waived sovereign immunity.

In affirming, the Tenth Circuit addressed whether the claims asserted by the department arose out of the same transaction or occurrence as debtor's claim. *Id.* at 1391. The court found the state had removed all doubt that the filing of its proofs of claim was linked to the decertification that prompted Straight's action. *Id.* The proofs of claim were for unemployment taxes and unpaid workers compensation premiums.

Following the bankruptcy court's original rulings, the department filed a motion for new trial. In an effort to convince the court it had not taken prejudicial action prohibited by section 525, the department asserted it did not suspend debtor's certification based on her bankruptcy filing. Rather, it suspended debtor based on the revocation of debtor's bonding and the amount of unpaid payroll liability owed by debtor. *Id.*

This admission was critical. Both the bonding and payroll liabilities were directly related to debtor's business operations. It was clear to the Court that the proofs of claim and the motion filed by Ms. Straight arose out of the same transaction or occurrence, the operation of debtor's business. *Id.* at 1391–92.

*Straight* and *Pochiro* present a fairly easy application of the logical relationship test. In *Straight*, debtor's decertification was based in part on her unpaid payroll liability that was directly tied to the state's proofs of claim. In *Pochiro*, there were allegations Pochiro kept possession of confidential information and later filed an action against Prudential alleging slander, based on the same nucleus of fact. In *Lazar*, the state claim for UST fees and trustee's claim for reimbursement from the UST fund was based on a detailed statutory scheme under which claimants received priority based on various factors. The Ninth Circuit held both actions involved the fund and arose out of activities associated with the same bankruptcy. The court pointed out that "the Fund collects fees from owners and operators of underground storage tanks for the ultimate purpose of paying reimbursement claims when those tanks leak petroleum." *In re Lazar,* 237 F.3d at 980.[3]

## IV.

In the present case, the trustee objects to two proofs of claim based on the following:

9. As set forth in the supporting documentation to the proofs of claim filed by the Nation, the Nation entered into a lease with Don and Eula Davis for the rental of the location upon which Davis Chevrolet conducted its business. The Debtor is not an obligor, borrower or otherwise a signatory to the leases and documentation submitted in support of the Nation's claims.

10. By reason of the foregoing, the Nation does not have a valid and enforceable claim against the Debtor and the estate.

*See* Complaint at 3.

The trustee's claim objection in count one is narrowly focused on whether

---

**3.** However, non-UST claims were not logical-  ly related to the trustee's claim. *Id.* at n. 12.

the lease obligations were validly assigned or transferred to debtor. In determining whether there was an express immunity waiver by the Nation when it filed its claims, the proper focus is not on the claim defense presented at count one, but whether the theory of recovery set forth in trustee's count two is logically related to the two proofs of claim filed by the Nation.

Count Two requires examination whether the Nation or related entities violated the Navajo Preference Act and the Navajo Business and Procurement Act. The Nation asserts in its reply:

> The Navajo Nation's Claim No. 35 is based on a promissory note signed by Donald and Eula Davis. The factual basis is whether timely payments have been made and what was the balance as of the date of filing of the bankruptcy. There is simply no connection between this proof of claim and Plaintiff's second cause of action that the Navajo Nation violated the Navajo Business Preference Act ... and the Navajo Business and Procurement Act.

Reply at 2, 3.

As to the business lease, the basis for claim 36:

> Plaintiff has alleged the rental computation for the business site rental is based on business with the Navajo Nation including preferences under the [Acts].... This representation is clearly erroneous. Sales to the Navajo Nation, Navajo Tribal Utility Authority, Navajo Housing Authority, and Navajo Nation Shopping Centers are specially exempted from the rental computation.... The facts as to whether Plaintiff would be a successful bidder on fleet purchases by the [Navajo entities], possess no logical relationship to the issue of whether Plaintiff has made the required pay-

ments on a lease issued under a federal leasing statute....

Reply at 3.

## V.

■ The question is whether the Nation's claims for payment on the note and lease arise out of the same transaction as the trustee's claims that the Nation's alleged violation of preference and procurement acts led to debtor's demise. " 'Transaction' is a word of flexible meaning." *Lazar* at 979. Given this flexibility, the claims (especially the claim related to default on the note) are logically related to the second cause of action.

■ Facts necessary to establish whether debtor owed money to the Nation under the note or lease are part of a nucleus of facts to determine whether debtor lost its certification and are logically related to whether the Nation violated its laws and procedures in allegedly depriving debtor of a business preference.

Debtor was a certified business entitled to preference under Navajo law. In denying preference in tribal contracts, the Nation had to determine whether debtor was current in its obligations to the tribe. Eligibility of the applicant is confirmed by either: (1) Evidence of compliance, verifying the initial eligibility of the applicant in that none of the conditions cited in applicable sections of the Act occurred; or (2) Evidence of clearance verifying that the applicant has since remedied all applicable bases for previous ineligibility and is currently eligible as an applicant. Section 1504B of Chapter 15, Navajo Business and Procurement Act, T. 12 § 1504, hereafter, 12 N.N.C. 1504B.

Section 1505 of the Act governs ineligibility. Under that section, no applicant is eligible to do tribal business if any of the following circumstances apply:

A. If there is an outstanding money judgment in favor of the Navajo Nation or a valid delinquent accounts receivable debt which is due and owing to the Navajo Nation from that applicant entity either in its present form or in any other identifiable capability as an individual, business corporation, partnership, or other entity; or

B. If under any transaction, contract or legal relationship with the Navajo Nation, there has been evidence of default or materially deficient business practices or failure to meet a material contractual or financial obligation to the Navajo Nation or failure to materially comply with applicable laws or material delay by that applicant entity either in its present form or in any other identifiable capacity as an individual, business, corporation, partnership, or other entity, resulting in monetary or other detriment to the Nation which remains uncured; or

C. If that applicant entity either in its present form or in any other identifiable capacity has been found to have engaged in unlawful or criminal actions or other activities which adversely reflects on the honesty and moral character of said party so as to make any dealings with the Navajo Nation undesirable; or

D. If the individual or any individuals of the applicant entity either in its present form or in any other identifiable capacity has been convicted of a criminal offense within the previous ten years for embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or committing a criminal offense relating to obtaining a public/private contract or in the performance of such contract. 12 N.N.C. 1505.

Section 1506 governs removal of ineligibility. If an applicant was determined to be ineligible under 1505(A) (judgment against applicant or delinquent on a valid receivable owing to the Nation), applicant could pay the outstanding amount owed to the Nation. Upon full payment, applicant would be eligible under 1505(A) for business opportunities, procurement activities and loans from the Nation.

If applicant was ineligible under the remaining provisions of 1505(B–D), removal of ineligibility would be governed by the rules and regulations promulgated by the Nation.

Section 1508 governs the administrative review process and allows an applicant seven calendar days from receipt of a determination of ineligibility to file a written appeal with a hearing officer. The hearing officer must render a final decision within 30 days. All final decisions must include findings of fact, conclusions of law and reasons.

A final decision of the hearing officer could be appealed to the Navajo Nation Courts. Section 1509. An appeal would be limited to questions of law and the findings of fact would be sustained, providing there was some basis in the evidence for the findings. *Id.*

Based on this statutory scheme, a default by Davis on the note or lease could trigger loss of certification. Notice and an opportunity for a hearing was required if applicant objected to the determination of ineligibility. Based on the allegations in the complaint, which must be accepted as true for purposes of this motion, no such determination was made and the Nation violated its statutory scheme.

This case is similar to *Straight.* There, the state violated the automatic stay and section 525 when it decertified debtor post petition, in part based on unpaid payroll liability taxes owed by debtor, the very basis of the claims filed by the state. It was easy to find a logical relationship be-

tween the government's claims and debtor's claims against the government.

Here the lease and note liability, set forth in the proofs of claim, are logically related to whether the Nation properly followed the preference and procurement acts in determining eligibility. One basis for ineligibility is whether applicant defaulted on an obligation owing to the Nation. Section 1505(A). Asserted violation of the preference statutes by the governmental unit is linked closely to the bankruptcy claims filed by the government. The claims appear based on fairly typical debtor-creditor relations, which could exist whether or not debtor applied for preferential treatment under the Act. However, as in *Straight*, debtor's failure to pay allegedly triggered decertification. In this case, if debtor's defaults triggered the Nation's denial of preferential treatment under the Acts, there is a logical relationship. The Nation thus waived its sovereign immunity as to Complaint Count Two by filing its proofs of claim.[4]

## VI.

Section 106(b) supports this result. Congress there provides that when a governmental unit files a bankruptcy claim, the governmental unit is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and arose out of the same transaction and occurrence out of which the claim arises. 11 U.S.C. § 106(b); *In re Lazar, supra* at 980. Section 106(b) tracks language of Federal Rule of Civil Procedure 13(a) which defines a compulsory counterclaim as a claim which arises out of the transaction or occurrence that is the subject of the opposing party's claim. *Wyoming Department of Transportation v. Straight (In re Straight)*, 209 B.R. 540, 557 (D.Wyo.1997), *judgment affirmed*, 143 F.3d 1387 (10th Cir.1998), *cert. denied*, 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998).[5]

Since count two does appear to be in the nature of a compulsory counterclaim, section 106(b) provides a statutory waiver of sovereign immunity.

## VII.

Finding that immunity has been waived, should this court hear the case?

---

4. The trustee asserts the resolution approving a lease modification makes it clear the Acts are inextricably related to the proofs of claim. The resolution at 1(d) does indicate that vehicle sales to the named Navajo related entities are exempt from the rental computation. Further, the modification (attached to the resolution) indicates the rent is modified to include the exemption and also provides that the purpose of the lease is modified to include sale of insurance, towing service, auto parts, etc.

It is not clear how these modifications are inextricably related to the claims filed by the Nation. The trustee is not alleging that the Nation is improperly taxing exempt vehicles. It is merely an indication that an exemption was granted and the formula changed for rent computation.

However, if the basis for ineligibility is debtor's defaults under the note and or lease,

there is a logical relationship between the respective counts.

5. At least one court has concluded that Indian tribes are not governmental units as defined by § 101(27). *In re National Cattle Congress*, 247 B.R. 259, 266–67 (Bankr.N.D.Iowa 2000). That court indicated that use of the words "or other foreign or domestic government" was not specific enough to conclude Congress meant to abrogate sovereign immunity of Indian tribes when it referenced "governmental unit" in § 106. This is a disputed proposition. *Id.* It seems to this court that "other domestic government" is broad enough to encompass Indian tribes. *See also In re Greene*, 980 F.2d at 597 (assuming "without deciding, that Indian tribes are 'governmental units' for the purposes of section 106)." *See also* n. 2, *supra*.

## A.

█ Abstention can exist only where there is a parallel proceeding in another court. Inherent in the concept of abstention is the presence of a pendant state court action for which the federal court may abstain. *Security Farms v. International Brotherhood of Teamsters*, 124 F.3d 999, 1009 (9th Cir.1997). "To require a pendant state action as a condition of abstention eliminates any confusion with 28 U.S.C. 1452(b) which provides ... authority to remand civil actions properly removed to federal court in situations where there is no parallel proceeding. Section 1334(c) should be read in *pari materia* with 1452(b) remand, so that the former applies only in those cases in which there is a related proceeding that either permits abstention in the interest of comity, section 1334(c)(1), or that, by legislative mandate, requires it, section 1334(c)(2)." *Id.* at 1010. *See also In re Lazar*, 237 F.3d at 981.

Here there is no parallel proceeding. Abstention is not available.

## B.

Section 1452(b) of Title 28, U.S.Code provides: The court to which such cause of action is removed may remand such claim or cause of action on any equitable ground.

█ The "any equitable ground" remand standard is an unusually broad grant of authority. It subsumes all reasons for remand under non bankruptcy removal statutes. *McCarthy v. Prince (In re McCarthy)*, 230 B.R. 414, 417 (9th Cir. BAP 1999). Courts consider the following factors in deciding whether to remand: judicial economy; the presence of substantial questions of state law; comity; and the possibility of inconsistent factual findings. *Matter of Medical Laboratory Management Consultants*, 931 F.Supp. 1487, 1493 (D.Ariz.1996).

█ Here, remand is inapplicable. This matter originated in this court and was not removed from another court.

## C.

Both sides discussed the issue of exhaustion. For reasons noted below, it does not apply in this case.

*National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985), held a party must exhaust tribal court remedies before a federal district court may entertain a challenge to tribal jurisdiction. The Supreme Court concluded that the congressional policy of supporting tribal self-government favors a rule that provides the forum whose jurisdiction is being challenged the first opportunity to evaluate the challenge. *Yellowstone County v. Pease*, 96 F.3d 1169, 1171 (9th Cir.1996); *cert. denied*, 520 U.S. 1209, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997).

█ This principal is prudential, not jurisdictional. *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 1412, 137 L.Ed.2d 661 (1997). Exhaustion is required as a matter of comity. Respect for tribal self-government makes it appropriate to give the tribal court a full opportunity to determine its own jurisdiction. *Id.*

Two recent Supreme Court opinions examine the exhaustion principle. *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), noted the court had earlier discussed whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians. *Id.* at 1437. The Court held, "initially, that federal courts have authority to determine, as a matter 'arising under' federal law ... whether a tribal court has exceeded the limits of its jurisdiction ... After concluding that fed-

eral courts have subject-matter jurisdiction to entertain such a case, we announced that, prudentially, a federal court should stay its hand 'until after the Tribal Court has had a full opportunity to determine its own jurisdiction.' " *Id.*

The court indicated that "[e]xhaustion was appropriate in each of those cases because 'Congress is committed to a policy of supporting tribal self-government ... [which] favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.' " *Id.*

*Neztsosie* declined to extend this principle. First, under the facts and law of the case, the Court faced an unusual preemption provision. The Price–Anderson Act transforms into a federal case any public liability action arising out of a nuclear incident. The Act not only gave a district court original jurisdiction over such claim, but also provided for removal to a federal court as of right, if a Price–Anderson action is brought in state court. Congress thus expressed a clear preference for a federal forum, at the request of the defending party, for a Price–Anderson claim on the merits and for determining whether a claim falls under Price–Anderson when removal is contested. *Id.*

After review of the Act and its legislative history, the Court indicated that "[a]pplying tribal exhaustion would invite precisely the mischief of 'duplicative determinations' and consequent 'inefficiencies' that the Act sought to avoid...." *Id.* at 1438.

Another recent Supreme Court decision considered whether "petitioners were required to exhaust their jurisdictional claims in Tribal court before bringing them in Federal District Court." *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304,

2315, 150 L.Ed.2d 398 (2001). The Court noted that

In *National Farmers Union* we recognized exceptions to the exhaustion requirement, where 'an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, ... or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction'.... None of these exceptions seems applicable to this case, but we added a broader exception in *Strate*: '[w]hen ... it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by Montana's main rule, so the exhaustion requirement would serve no purpose other than delay.' 520 U.S. at 459–460, and n. 14, 117 S.Ct. 1404, 137 L.Ed.2d 661. Though this exception too is technically inapplicable, the reasoning behind it is not. Since it is clear, as we have discussed, that tribal courts lack jurisdiction over state officials for causes of action relating to their performance of official duties, adherence to the tribal exhaustion requirement in such cases 'would serve no purpose other than delay', and is therefore unnecessary.

*Id.*

■ Here tribal courts would have jurisdiction but for the bankruptcy. Debtor is an organization that operated on the Navajo Reservation. Defendants to the second cause of action are either tribal members or the tribal government. Navajo law governs the result. That tribal courts would have jurisdiction is conceded by the trustee: "Of course, absent bankruptcy, the tribal court would likely have jurisdiction as it would appear to be the only apparent tribunal where jurisdiction over the Navajo Nation could be obtained where the

Navajo Nation has consented to suit and waived immunity." Response at n. 8.

However, one district court, citing *Neztsosie,* held the doctrine "does not apply to cases involving matters as to which 'Congress ... expressed an unmistakable preference for a federal forum.' ... Particularly in light of the court's conclusions that this is a core proceeding over which the bankruptcy court has sole and exclusive jurisdiction ... the court is not persuaded that the tribal exhaustion doctrine is applicable." *Chickaway v. Bank One Dayton, N.A.,* 261 B.R. 646, 652 (S.D.Miss. 2001). Likewise, another court noted that "[i]n the unique realm of bankruptcy, the Court finds that the exhaustion rule ... simply does not apply." *In re Haines,* 233 B.R. 480, 484 (Bankr.D.Mont.1999); *Aff'd,* 245 B.R. 401 (D.Mont.2000).

In the present case, it is not clear what purpose exhaustion would serve. This is a core proceeding pursuant to section 157(b)(2)(C) (counterclaim by the estate against persons filing claims against the estate). 28 U.S.C. § 157(b)(2)(C).

Exhaustion through tribal Court would only delay matters. The Court will retain jurisdiction to hear this matter.

## VIII.

Defendant's motion to dismiss will be denied.